United States District Court
For the Northern District of California

1
2
3              UNITED STATES DISTRICT COURT
4              NORTHERN DISTRICT OF CALIFORNIA
5
6   MARQUEZ BRIGGS,
7              Petitioner,                    No. C 11-3237 PJH
8        v.
                                             **ORDER DENYING PETITION FOR**
9   ANTHONY HEDGPETH, Warden,                **WRIT OF HABEAS CORPUS AND**
                                             **ISSUING CERTIFICATE OF**
10             Respondent.                    **APPEALABILITY**
    _____/
11
12         Before the court is the petition for a writ of habeas corpus pursuant to 28 U.S.C.
13   § 2254 filed by Marquez Briggs ("Briggs"), a state prisoner.  On July 8, 2011, the court
14   issued an order to show cause why a writ of habeas corpus should not issue.  Respondent,
15   Warden at Salinas Valley State Prison, filed an answer and response to the order to show
16   cause.  Briggs filed a traverse.  The court determines that the matter is suitable for decision
17   without oral argument.  Having reviewed the papers and the record, and having carefully
18   considered the arguments and the relevant legal authorities, the court DENIES the petition.
19                         **BACKGROUND**
20   **I.    Procedural History**
21         On March 25, 2008, a jury in the Alameda County Superior Court convicted Briggs of
22   oral copulation by force in concert in violation of California Penal Code § 288a(d); sodomy
23   by force in concert in violation of California Penal Code § 286(d); and carjacking in violation
24   of California Penal Code § 215(a).  The jury further found true a kidnap allegation and
25   several firearm enhancement allegations.  On April 22, 2008, the court sentenced Briggs to
26   twenty-five years to life in prison, to be served consecutively to a determinate term of 20
27   years and eight months.
28

United States District Court

For the Northern District of California

1    Briggs appealed to the California Court of Appeal, which affirmed his conviction on

2    December 30, 2009.  The California Supreme Court denied review on April 14, 2010.

3    Briggs filed the instant petition on June 30, 2011.

4    **II.    Factual Background**

5    The following summary of evidence presented at Briggs's trial is taken directly from

6    the opinion of the court of appeal affirming the judgment.  Answer, Ex. B (*People v. Briggs*,

7    Case No. A121332 (Cal. Ct. App. Dec. 30, 2009)).

8        **A.    Prosecution Evidence**

9    The victim, John Doe, testified he was 40 years old and had moved to the United

10   States from Mexico in 1996.  In August 2004, John Doe was living with his teenage son.

11   John Doe's primary language was Spanish, and he could speak and read a little English.

12   At approximately 10:00 or 11:00 p.m. on August 21, 2004, John Doe went to listen to

13   ranchera music at Fandango Latino, a Latino nightclub on San Leandro Street in Oakland.

14   He parked his truck on the street a block away from the club because the parking lot was

15   full.  John Doe sat at a table by himself and consumed about six beers from the time he

16   arrived until he left the club at approximately 1:00 or 1:30 a.m.

17   Upon leaving, John Doe went to his truck and opened the passenger door to smoke

18   a cigarette.  He then went around to the driver's side and as he opened the door, he saw

19   two African-American males approaching him.  The tall, slender male was carrying a .45

20   caliber or 9 millimeter handgun in his hand.  The other individual was shorter and heavyset.

21   The armed male pointed the gun to John Doe's head.

22   The men called John Doe "scrap," cursed, and threatened him.  They entered John

23   Doe's truck and pulled John Doe inside.  The thin man sat next to John Doe, and the

24   heavier man was on the passenger side.  Once all three men were in the truck, the

25   assailants told John Doe "go, go," and John Doe began driving the truck.  John Doe saw a

26   patrol car and sped up so the police car would follow him, but the men had John Doe turn

27   onto a different street and the police car continued away from them.  The men pointed the

28   gun at John Doe while he drove.  The men directed John Doe to stop the truck by railroad

2

1   tracks and then blindfolded him.  They forced John Doe to sit in the middle of the truck

2   bench seat, and the thin man began driving.  The men were speaking in English and John

3   Doe could not understand most of what they were saying.

4          When the truck stopped, the men pulled John Doe out of the vehicle.  The men

5   forced John Doe to kneel down and commanded him to orally copulate the slender man's

6   penis while they held a gun above his head.  John Doe complied because he felt his life

7   was in danger.  John Doe was able to recover his truck keys from the thin man's pocket

8   without his assailants noticing during the forced oral copulation.  When the oral copulation

9   stopped, the men forced John Doe to lower his pants and they pushed him forward onto his

10  hands and knees.  John Doe told them, "Don't shoot. Don't shoot."  John Doe heard the

11  thin man spit, and then felt moisture when the thin man put his hand on John Doe's anus.

12  The thin man first used his fingers, and then his penis, to penetrate John Doe's anus.  John

13  Doe could hear the men talking, mocking him, and laughing while he was being raped.

14  The penetration stopped because John Doe defecated on the assailant.  The thin man

15  became angry and John Doe offered to clean his assailant out of fear of being shot.  When

16  the thin man turned away from John Doe to begin cleaning himself, John Doe stood up,

17  took his blindfold off and began running down Foothill Boulevard.  John Doe recognized a

18  school and a store as he was running, and he looked for a patrol car to ask for help.  John

19  Doe lost consciousness while running away.

20         When he awoke, John Doe saw police officers and an ambulance.  John Doe

21  testified he told the paramedics and police what had happened to him.  He was taken to

22  Highland Hospital in the ambulance.

23         Thomas Lo, a paramedic for American Medical Response, responded to a call in the

24  area of 1627 Foothill Boulevard at around 4:00 a.m. on August 22, 2004.  He found John

25  Doe lying face down in the roadway in the middle of the block. A neighborhood resident

26  who was present at the scene indicated she had called and was concerned the victim had

27  been hit by a car.  Lo did not discover any obvious injuries during his examination of John

28  Doe, who had a wallet with identification indicating he was a police officer in Mexico.  John

United States District Court

For the Northern District of California

3

United States District Court

For the Northern District of California

1   Doe was upset and hysterical, answering some questions but not others.  He stated he had

2   been raped by two men, mentioned a gun, and the Fandango nightclub.  In his report, Lo

3   wrote "inconsistent story" because John Doe answered only some of the questions the

4   paramedics and responding police officers asked him, and Lo testified "it just didn't seem

5   that we could figure out what happened to him."  Lo assessed John Doe as having an

6   altered state of consciousness and testified that he had detected alcohol on John Doe's

7   breath.  Lo and his partner transported John Doe to Highland Hospital in the ambulance.

8          Lauri Paolinetti, a physician's assistant at Highland Hospital, testified as an expert in

9   sexual assault exams.  Paolinetti conducted a sexual assault exam on John Doe when he

10   was taken to Highland Hospital on August 22, 2004.  In her report, she stated John Doe

11   appeared "[t]earful, distraught, tre[m]bling, anxious."  She testified John Doe stated he did

12   not consume any alcohol within 12 hours prior to the assault, but that he had used drugs

13   within 96 hours prior to the assault.  John Doe described the assault to Paolinetti, and

14   complained of head, abdominal, and rectal pain.  Paolinetti found dried secretions on John

15   Doe's right hand and took samples of them.  She also found "[m]ultiple fissured lesions at 9

16   o'clock at anal verge.  Tender. Oozing blood."  Paolinetti examined John Doe with an

17   anoscope and noted, "[a]noscopy distal 1 centimeter 1 rectal wall with oozing 1 centimeter

18   to 2 centimeter, abrasion slash fissure.  Exam difficult secondary to pain.  Unable to insert

19   anoscope fully."  She collected two oral swabs, two anal swabs, and four penile swabs from

20   John Doe.  She concluded the results of the examination were consistent with

21   nonconsensual rectal penetration.

22          Oakland police officer Jesse Grant testified that he was assigned John Doe's case

23   on August 26, 2004, while working as an investigator in the special victims unit.  He

24   reviewed the police report prepared by the officer who interviewed John Doe at the

25   hospital.  On September 2, 2004, Grant contacted John Doe over the phone.  John Doe

26   told Grant he did not want to pursue the case because "the incident had been extremely

27   painful for him and he just wanted to let it lie from there."  Grant testified he had only a

28   general description of the assailants: their height, weight, and race.  He submitted the

4

sexual assault kit taken from the victim for processing by the crime lab.  He did not conduct any additional investigation at that time because of John Doe's reluctance to pursue the case and lack of suspects.

On January 5, 2005, Ines Iglesias-Lee a criminalist at the Oakland Police Department crime laboratory, retrieved the sexual assault kit samples collected from John Doe.  The first sample she analyzed was a rectal swab.  She conducted a test for acid phosphatase which is an enzyme found in high concentrations in semen and in lower concentrations in other bodily fluids.  This presumptive test resulted in "a low amount of reaction which may or may not indicate the possible presence of semen."  She was not able to confirm the presence of blood on the rectal swab because one of the two color tests was negative.  Iglesias-Lee next examined two urethral meatus swabs, which she tested for the presence of acid phosphatase.  One of the swabs tested negative, and the second swab gave a low or slow positive result.  Acid phosphatase tests on two penal swabs resulted in a negative result for one swab and a slow reaction for the presence of semen on the second swab.  Iglesias-Lee conducted a differential extraction on a rectal swab and found there were epithelial cells and sperm cells present.  She then developed DNA profiles from both sperm and epithelial cells.  Both types of cells had come from males.  The DNA profile of the epithelial cells was concordant with the DNA profile of the victim, i.e. there was a match at the locations of the DNA analyzed.  Iglesias-Lee also examined swabs taken from the victim's right hand, and found epithelial and sperm cells.  Tests on the epithelial cell fraction showed there were cells from two or more people.  The sperm fraction from the swab typed as a mixture of no more than two people, and the major portion of the mixture was concordant to the DNA profile from the sperm fraction of the rectal swab.  The DNA profile of the sperm cells was different from the victim's DNA profile, and Iglesias-Lee eliminated the victim as a possible contributor to the sperm cells found.

On May 18, 2005, Iglesias-Lee entered the DNA profile from the sperm cell fractions into the Combined DNA Indexing System (CODIS) database.  On July 22, 2005, Iglesias-Lee received a report of a "hit" on that DNA profile from the California Department

United States District Court

For the Northern District of California

1  of Justice DNA laboratory in Richmond, indicating that it corresponded with Briggs's DNA

2  profile.  Iglesias-Lee compared the profiled hit the Department of Justice provided with the

3  evidence DNA profile and noted that the types were concordant.  She then requested

4  officer Grant to obtain a DNA sample from Briggs for verification.

5      In May 2006, Grant reopened the case because he received the report from the

6  Crime Lab naming Briggs as a potential suspect.  Grant contacted John Doe and, with a

7  Spanish-speaking officer, on May 26 obtained a statement from John Doe and examined

8  John Doe's truck.  Grant went with John Doe to the Fandango club, and John Doe was able

9  to go to a location on East 20th Street and find the driveway alongside a house where the

10  sexual assault occurred.

11      On November 14, 2006, Grant interviewed Briggs, who gave a taped statement.

12  Grant obtained a search warrant authorizing the taking of a DNA sample from Briggs.

13  Briggs was uncooperative and resistive, but the officers were able to get a sample from the

14  inside of his cheek.

15      Iglesias-Lee was presented by the prosecution as an expert in the fields of forensic

16  biology and DNA analysis.  She testified that on November 28, 2006, Iglesias-Lee received

17  a biological reference kit from Briggs.  She developed Briggs's DNA profile from the saliva

18  samples provided, and compared that profile to the unknown sperm DNA profile she had

19  generated earlier.  From this comparison, she could not exclude Briggs as being the source

20  of the sperm cells found in the rectal and hand swabs of the case.  Over defense objection

21  that the testimony exceeded the scope of her expertise, Iglesias-Lee testified as to the

22  statistical significance of the DNA profile generated from the sperm cell fraction.

23  Iglesias-Lee utilized a computer program created by the FBI called Pop Stats which is an

24  element of the CODIS program, and which calculates the statistical frequency of a

25  particular DNA profile.  The analysis showed the DNA profile of the semen cell fraction

26  obtained from the evidentiary samples occurs in less than 1 out of 1.5 trillion members of

27  the Caucasian, African-American, Southwest Hispanic, and Southeast Hispanic

28  populations, compared to a current world population of approximately 6.5 billion.  She

6

1  further testified it was highly unlikely that DNA profile would be found by chance in another

2  person.

3      John Doe identified Briggs as his assailant at trial, stating he was 70 to 80 percent

4  certain Briggs was the thin assailant.

5      **B.    Defense Case**

6      The defense called Oakland police officer Phong Tran to testify.  Tran interviewed

7  John Doe in the morning of August 22, 2004, at Highland Hospital.  John Doe reported he

8  was assaulted by two African-American males after leaving the Fandango nightclub.  John

9  Doe told the officer that after he was assaulted he ran back to the club for help and

10 someone at the club called 911.  John Doe told Tran that he did not know whether the

11 assailants had taken his truck.  Tran wrote John Doe's statement and John Doe signed it.

12 Tran obtained authorization for a sexual assault examination, and then went to the

13 Fandango club to try to locate John Doe's truck and any witnesses.  He did not find the

14 truck and the club was closed.

15     Defense investigator Dean Stannard testified there are multiple routes from the

16 Fandango club to the driveway on East 20th Street where John Doe was assaulted, and

17 the route Stannard drove between the two locations took him 16 minutes.  On

18 cross-examination, Stannard acknowledged he was not aware which route John Doe and

19 his assailants took.  Stannard also testified that paramedics found John Doe six-tenths of a

20 mile from where he lived at the time.

21                          **ISSUES**

22     Briggs raises the following claims for federal habeas relief:

23      (1) the state court's denial of his request for disclosure of alleged immigration

24 benefits received by prosecution witness, John Doe, violated his due process rights under

25 *Brady v. Maryland,* 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972);

26     (2) the state court's refusal to allow him to cross-examine prosecution witness, John

27 Doe, regarding the prosecution's promises and provision of immigration benefits to Doe

28

1  violated his Fifth Amendment due process rights and his Sixth Amendment right of
2  confrontation; and

3        (3) the state court's limitations regarding his ability to cross-examine the
4  prosecution's expert witness, criminalist Ines Iglesias-Lee, regarding her understanding of a
5  statistical figure provided by a computer violated his Fifth Amendment due process rights
6  and his Sixth Amendment right of confrontation.

7                                          **ANALYSIS**
8  **I.      Standard of Review**

9        A district court may not grant a petition challenging a state conviction or sentence on
10  the basis of a claim that was reviewed on the merits in state court unless the state court's
11  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an
12  unreasonable application of, clearly established Federal law, as determined by the
13  Supreme Court of the United States; or (2) resulted in a decision that was based on an
14  unreasonable determination of the facts in light of the evidence presented in the State court
15  proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to
16  mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),
17  while the second prong applies to decisions based on factual determinations, *Miller–El v.*
18  *Cockrell*, 537 U.S. 322, 340 (2003).

19        A state court decision is "contrary to" Supreme Court authority, that is, falls under the
20  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that
21  reached by [the Supreme] Court on a question of law or if the state court decides a case
22  differently than [the Supreme] Court has on a set of materially indistinguishable facts."
23  *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable
24  application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it
25  correctly identifies the governing legal principle from the Supreme Court's decisions but
26  "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The
27  federal court on habeas review may not issue the writ "simply because that court concludes
28  in its independent judgment that the relevant state-court decision applied clearly

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

2  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

3      A state court's determination that a claim lacks merit precludes federal habeas relief

4  so long as "fairminded jurists could disagree" on the correctness of the state court's

5  decision.  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v.*

6  *Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

7  unreasonable requires considering the rule's specificity.  The more general the rule, the

8  more leeway courts have in reaching outcomes in case-by-case determinations."  *Id.*  "As a

9  condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

10  show that the state court's ruling on the claim being presented in federal court was so

11  lacking in justification that there was an error well understood and comprehended in

12  existing law beyond any possibility for fairminded disagreement."  *Id.*

13      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

14  determination will not be overturned on factual grounds unless objectively unreasonable in

15  light of the evidence presented in the state-court proceeding."  *Miller–El*, 537 U.S. at 340.

16  Review under § 2254(d)(1) is limited to the record that was before the state court that

17  adjudicated the claim on the merits.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

18  **II.    *Brady* Claim**

19      **A.    Trial Proceedings**

20      The following summary of the trial court's rulings on Briggs's request to question the

21  complaining witness, John Doe, about his immigration status is taken directly from the

22  opinion of the court of appeal.  Answer, Ex. B at 8-10.

23      Briggs filed a motion in limine asking for permission to examine John Doe, an

24  undocumented Mexican national, on the issue of bias arising from purported offers by

25  investigating officers to assist him in qualifying for United States residency.  The

26  prosecution had previously moved in limine to exclude evidence of John Doe's immigration

27  status under Evidence Code section 352.  At the initial hearing on the defense motions,

28  defense counsel represented that during a taped interview of John Doe in 2006, one of the

United States District Court

For the Northern District of California

1    investigating officers had given John Doe papers to help him qualify for residency and had

2    told John Doe that being the victim of a crime could help him in establishing residency.

3    Based on the defense offer of proof, the trial court indicated that it would allow the defense

4    to question John Doe on whether the officers told him being the victim of a crime could help

5    him qualify for residency and whether John Doe had obtained any favors from the officers.

6         The prosecutor later asked the court to reconsider its earlier rulings.  The prosecutor

7    explained that she had since reviewed the tape of the interview, and that defense counsel's

8    offer of proof was not entirely accurate, particularly as to the context of the statements

9    attributed to the police officers.  She provided what were represented as verbatim excerpts

10   of the statements.  After providing officers his account of the circumstances of the attack,

11   John Doe stated, "You know I don't have any papers here so I'm scared it will affect me."

12   One of the officers responded, "You don't need to worry about that."  An officer said, "I have

13   assisted people in the past . . . I have signed papers for immigration assistance and they

14   can actually qualify for residentship [sic ]."  Officer Grant then stated, "Oh, yeah, definitely

15   being the victim of crime."  After that colloquy, John Doe and the officers discussed a

16   different topic.

17        The trial court observed that the prosecution's description of the conversation

18   differed from statements defense counsel had attributed to the officers, and ruled that the

19   inquiry requested by the defense would not be permitted.  The court found that the

20   statements were irrelevant, since they occurred two years after John Doe's initial report of

21   the incident, and only following the victim's description of the circumstances of the assault.

22        The following day defense counsel again sought permission to question John Doe

23   about his immigration status.  She contended that John Doe's willingness to pursue

24   prosecution in 2006, after his reluctance to do so in 2004, was in response to police

25   providing him with "papers to help his immigration status to obtain residency" and that the

26   inquiry was therefore relevant to show his "bias and motive."  The trial court again denied

27   the defense's request, finding the line of questioning irrelevant because the context of the

28

10

United States District Court
For the Northern District of California

1    interview and the circumstances under which discussion of immigration issues occurred

2    were "totally different" than represented by the defense.

3            After return of the jury verdicts, Briggs filed a motion for new trial, arguing inter alia

4    that the trial court should have allowed him to cross-examine John Doe regarding his

5    immigration status and any benefits he may have received for his cooperation in the

6    prosecution.  The prosecution response denied that John Doe had obtained any assistance

7    in obtaining citizenship or that he received any other benefits or compensation in exchange

8    for his testimony, and also asserted that the Oakland Police Department did not provide

9    any "papers," promises, or assistance to John Doe in order to obtain a statement from him.

10   The trial court denied Briggs's motion.

11           The court of appeal affirmed the judgment and held that the trial court's exclusion of

12   the proffered evidence of John Doe's immigration status, and any benefits he may have

13   received for testifying, was not an abuse of discretion and did not violate Briggs's right of

14   confrontation.  Answer, Ex. B.

15       **B.    Legal Standard**

16           Briggs's first claim for relief alleges that his due process rights were violated by the

17   prosecution's failure to disclose impeachment material, which he contends was required

18   under *Brady v. Maryland*, 373 U.S. 83 (1963).  To establish a *Brady* violation, the evidence

19   must be (1) favorable to the accused because it is either exculpatory or impeachment

20   material; (2) suppressed by the government, either willfully or inadvertently; and

21   (3) material or prejudicial."  *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004)

22   (citing *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002)).

23           Impeachment evidence is exculpatory evidence within the meaning of *Brady*.  *Id.*

24   (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  "*Brady/Giglio* information

25   includes material that bears on the credibility of a significant witness in the case."  *Id.*

26   (citation and quotation marks omitted).  Impeachment evidence is favorable to the accused

27   under *Brady/Giglio* "when the reliability of the witness may be determinative of a criminal

28   defendant's guilt or innocence."  *Id.* (citation and quotation marks omitted).

United States District Court
For the Northern District of California

1   "'Because the prosecution is in a unique position to obtain information known to

2   other agents of the government, it may not be excused from disclosing what it does not

3   know but could have learned.'" *Id.* at 388 (quoting *Carriger v. Stewart*, 132 F.3d 463, 480

4   (9th Cir. 1997) (en banc)).  "A prosecutor's duty under *Brady* necessarily requires the

5   cooperation of other government agents who might possess *Brady* material."  *Id.*

6       The terms "material" and "prejudicial" are used interchangeably to describe the third

7   component of a *Brady* claim.  *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003).  *See*

8   *also Benn*, 283 F.3d at 1053 n. 9 ("Evidence is not 'material' unless it is 'prejudicial,' and

9   not 'prejudicial' unless it is 'material'").  The "touchstone of materiality is a 'reasonable

10  probability' of a different result."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  This

11  reasonable probability is "shown when the government's evidentiary suppression

12  'undermines confidence in the outcome of the trial.'" *Id.* (quoting *United States v. Bagley*,

13  473 U.S. 667, 678 (1985)).  A determination of materiality under the *Brady* standard

14  requires the evidence to be considered collectively, and in light of the strength of the

15  prosecution's case.  *Kyles*, 514 U.S. at 434.  *See also Barker v. Fleming*, 423 F.3d 1085,

16  1100 (9th Cir. 2005).

17      **C.    Discussion**

18      Briggs contends that the State's failure to disclose impeachment evidence violated

19  his right to due process under *Brady*.  As to the first element of a *Brady* claim, the proffered

20  evidence that the victim was motivated by potential immigration benefits satisfies the "low,

21  'favorable to the accused standard'" for impeachment material.  *Gantt v. Roe*, 389 F.3d

22  908, 912 (9th Cir. 2004).  As recognized by the court of appeal, under state law, "bias on

23  the part of a witness is a statutory basis for cross-examination."  Answer, Ex. B at 11 (citing

24  Cal. Evid. Code § 780(f)).

25      With respect to the suppression element of a *Brady* claim, "[t]he prosecutor's duty to

26  disclose under *Brady* is limited to evidence a reasonable prosecutor would perceive at the

27  time as being material and favorable to the defense."  *Woods v. Sinclair*, 655 F.3d 886,

28  902-03 (9th Cir. 2011) (citing *Kyles*, 514 U.S. at 438).  The record demonstrates that

12

United States District Court

For the Northern District of California

1   Briggs's trial attorney had access to and reviewed the tape of the 2006 interview when the

2   victim mentioned his immigration status to the officers, one of whom indicated that in the

3   past he had signed papers for immigration assistance.  Answer, Ex. D at 128-29.  Briggs

4   concedes that the officers made no promises to procure the victim's statement in the 2006

5   interview: "[t]he officers did not specifically promise [the complaining witness] that they

6   would submit papers to the immigration authorities."  *See* Reply ISO Mot. Disclose and for

7   Evid. Hrg. at 3.  He contends, however, that this interview should be construed as a

8   promise by the officers to provide immigration assistance if the victim testified and that the

9   prosecutor withheld evidence of immigration benefits that were bestowed upon the victim in

10  exchange for his cooperation.

11        Briggs fails to show that evidence of immigration assistance by the officers was

12  either willfully or inadvertently withheld, as no such evidence is in the record.  The court of

13  appeal found that the "prosecution denied that John Doe had obtained any assistance in

14  obtaining citizenship."  Answer, Ex. B at 10.  Turning to the prosecutor's statement in the

15  record, in a written response to Briggs's motion for new trial, the deputy district attorney

16  addressed the speculation by the defense that the victim's testimony was obtained "in

17  exchange for some type of help with obtaining citizenship," and represented as follows:

18  "The People did not provide any type of assistance to the Victim in obtaining citizenship in

19  exchange for his testimony in this case. . . .  The Victim did not receive any special help or

20  compensation from the Prosecution in exchange for testimony.  In addition, the Oakland

21  Police Department did not provide any 'papers' to the Victim in exchange for his testimony."

22  Answer, Ex. A at 314.  In affirming the judgment and conviction, the court of appeal held

23  that the record "does not support a finding the prosecution withheld evidence regarding

24  John Doe's immigration status or any benefits he may have received."  Answer, Ex. B at

25  14.

26        The state court's determination of a factual issue made by a State court is presumed

27  to be correct, and Briggs fails to rebut the presumption of correctness by clear and

28  convincing evidence.  28 U.S.C. § 2254(e)(1).  Briggs contends that the prosecutor's

United States District Court

For the Northern District of California

representation that the victim did not receive any consideration should not end the *Brady*

inquiry.  Traverse at 4.  He argues that the prosecutor may not have known if a detective

had prepared a U-Visa[1] certification.  *Id.* at 5.  Briggs offers no facts to support this

supposition and the record demonstrates that the prosecutor was aware of these

suspicions and directly addressed them, as reflected in the court of appeal's finding that the

"prosecution denied that John Doe had obtained any assistance in obtaining citizenship."

Answer, Ex. B at 10.  The court of appeal also noted that Briggs raised a challenge to the

trial court's acceptance of the prosecutor's unsworn statement as true, but held that "[t]he

disclaimer of promises or benefits to the victim is nevertheless a representation made by an

officer of the court, who has a duty of honesty and candor."  Answer, Ex. B at 14 n.10

(citing Rules Prof. Conduct, Rule 5-200; *Batt v. City and Co. of San Francisco*, 155 Cal.

App. 4th 65, 82 n.9 (2007)).  In light of the evidence in the record, the court of appeal's

factual determination that there was no *Brady* violation was not objectively unreasonable.

28 U.S.C. § 2254(d)(2).

Briggs also contends that, as a matter of law, the court of appeal erroneously held

that the trial court must accept the prosecutor's statement that all exculpatory evidence had

been disclosed, arguing that the Supreme Court would not have had occasion to decide

*Brady* and its progeny if the prosecution always disclosed all exculpatory evidence.

Traverse at 4-5.  The Supreme Court has held, however, that "[u]nless defense counsel

becomes aware that other exculpatory evidence was withheld and brings it to the court's

attention, the prosecutor's decision on disclosure is final.  Defense counsel has no

constitutional right to conduct his own search of the State's files to argue relevance."

*Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) (footnote omitted).

---

[1]    Pursuant to 8 C.F.R. § 214.14, an undocumented alien is eligible for U-1 nonimmigrant status if, among other things, he is the victim of rape or other qualifying criminal activity that occurred in the United States, and cooperates in the prosecution of the crime.  For a discussion of the statutory and regulatory background of the "U" nonimmigrant classification, see *Catholic Charities CYO v. Chertoff*, 622 F. Supp. 2d 865, 870 (N.D. Cal. 2008), *aff'd sub nom. Catholic Charities CYO v. Napolitano,* 368 Fed. Appx. 750 (9th Cir. 2010).

United States District Court

For the Northern District of California

1    Briggs cites no clearly established federal law, and the court is aware of none, that

2    requires the trial court to go beyond the prosecution's representations that it has disclosed

3    all *Brady* material to ensure whether the prosecution has satisfied its *Brady* obligations.

4    *See Kyles*, 514 U.S. at 437 ("the prosecution, which alone can know what is undisclosed,

5    must be assigned the consequent responsibility to gauge the likely net effect of all such

6    evidence and make disclosure when the point of 'reasonable probability' is reached").

7    Briggs argues that the court of appeal misapplied state law by holding that the trial court

8    must accept the prosecutor's word as true, citing *In re Steele,* 32 Cal. 4th 682 (2004).

9    Traverse at 4-5.  This argument fails to support a *Brady* claim because an alleged error of

10   state law is not a ground for habeas relief.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 861

11   (2011) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).  Furthermore, the court

12   determines that Briggs's argument is based on a misreading of *Steele,* where the California

13   Supreme Court reaffirmed the principle that "prosecutors have a continuing duty to disclose

14   information favorable to the defense, and we expect and assume that they will perform this

15   duty promptly and fully, and, moreover, that 'it is presumed that official duty has been

16   regularly performed.'"  *Steele*, 32 Cal. 4th at 694 (citing *People v. Gonzalez,* 51 Cal. 3d

17   1179, 1260-61 (1990); Evid. Code § 664).  In *Steele*, the court held that under California

18   Penal Code section 1054.9, a defendant is entitled to postconviction discovery of "materials

19   'in the possession of the prosecution and law enforcement authorities,' which we take to

20   mean in their possession currently[, . . . and] materials to which 'defendant would have

21   been entitled at time of trial' but does not currently possess."  *Id.* at 695.  The court in

22   *Steele* clearly held, however, that the statutory right to postconviction discovery "does not

23   allow 'free-floating' discovery asking for virtually anything the prosecution possesses."  *Id.*

24   *Steele* explained that "the expectation and assumption we stated in *Gonzalez* merely mean

25   that normally, and unless the defendant overcomes Evidence Code section 664's

26   presumption as to specific evidence, there will be no discovery for the trial court to order

27   that the prosecutor should have provided at trial."  *Id.* at 694.  Thus, *Steele* does not

28

United States District Court
For the Northern District of California

1    support Briggs's argument that the court of appeal erred by relying on the prosecutor's

2    statement in the record that the victim did not obtain assistance in obtaining citizenship.

3    Briggs fails to show that the prosecutor suppressed any purported impeachment

4    evidence.  Because Briggs fails to satisfy the suppression element in support of his *Brady*

5    claim, the court need not reach the question of materiality.  The court of appeal's

6    determination that there was no *Brady* violation was neither contrary to, nor an

7    unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  The

8    claim seeking habeas relief for a *Brady* violation is therefore DENIED.

9    **D.     Request to Expand the Record**

10   **1.     Request for Evidentiary Hearing**

11   Briggs requests an evidentiary hearing to cross-examine government agents and

12   law enforcement officials about the benefits that the victim received in support of his *Brady*

13   claim.  Briggs contends that he was not afforded the opportunity to develop the record as to

14   the immigration benefits that the federal government provided to the victim, and argues that

15   the court would not be able to weigh and determine any prejudicial effect of non-disclosure

16   without having a factual record of what benefits were actually conferred on the victim.

17   In opposition to Briggs's request for an evidentiary hearing, respondent contends

18   that Briggs did not diligently seek to expand the record on his *Brady* claim by pursuing

19   collateral relief in state court.  Prisoners in state custody who wish to challenge collaterally

20   in federal habeas proceedings either the fact or length of their confinement are first

21   required to exhaust state judicial remedies, either on direct appeal or through collateral

22   proceedings, by presenting the highest state court available with a fair opportunity to rule

23   on the merits of each and every claim they seek to raise in federal court.  *See* 28 U.S.C.

24   § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 515-16 (1982); *Duckworth v. Serrano*, 454

25   U.S. 1, 3 (1981); *McNeeley v. Arave*, 842 F.2d 230, 231 (9th Cir. 1988).  The state's

26   highest court must be given an opportunity to rule on the claims even if review is

27   discretionary.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (petitioner must invoke

28   "one complete round of the State's established appellate review process.").

United States District Court

For the Northern District of California

1    Exhaustion of claims does not require repeated assertions if a federal claim is

2  actually considered at least once on the merits by the state's highest court, even where

3  alternative avenues of review are still available in state court.  *See Castille v. Peoples*, 489

4  U.S. 346, 350 (1989); *Greene v. Lambert*, 288 F.3d 1081, 1086-87 (9th Cir. 2002).  Here,

5  Briggs complied with the fair presentation requirement by raising his *Brady* claim at every

6  level of state appellate review.  Briggs was not, therefore, required to seek collateral relief

7  in state court before pursuing federal habeas relief.  Briggs is not, however, entitled to an

8  evidentiary hearing on his *Brady* claim.

9    On habeas review under the Antiterrorism and Effective Death Penalty Act of 1996

10  ("AEDPA"), an evidentiary hearing is warranted where the petitioner establishes a colorable

11  claim for relief and was not afforded a hearing in state court on the claim.  *Earp v. Ornoski*,

12  431 F.3d 1158, 1167 (9th Cir. 2005); 28 U.S.C. § 2254(d) and (e)(2).  "In other words, a

13  hearing is required if: '(1) [the defendant] has alleged facts that, if proven, would entitle him

14  to habeas relief, and (2) he did not receive a full and fair opportunity to develop those

15  facts.'"  *Earp,* 431 F.3d at 1167 (quoting *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir.

16  2004)).  "In deciding whether to grant an evidentiary hearing, a federal court must consider

17  whether such a hearing could enable an applicant to prove the petition's factual allegations,

18  which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550

19  U.S. 465, 474 (2007).  When "the record refutes the applicant's factual allegations or

20  otherwise precludes habeas relief, a district court is not required to hold an evidentiary

21  hearing."  *Id.*  "[A]n evidentiary hearing is not required on issues that can be resolved by

22  reference to the state court record."  *Id.  See also Hibbler v. Benedetti*, 693 F.3d 1140,

23  1147 (9th Cir. 2012) (holding that state court's denial of prisoner's motion for evidentiary

24  hearing to determine whether he was competent at time he entered his guilty plea was not

25  objectively unreasonable), *petition for certiorari filed* Dec. 6, 2012.

26    As discussed above, the record does not support a finding of suppression by the

27  prosecutor and does not substantiate a colorable *Brady* claim.  *Cf. Insyxiengmay v.*

28  *Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005) (remanding a Confrontation Clause habeas

United States District Court

For the Northern District of California

1   claim for an evidentiary hearing where both the defendant and his counsel were barred

2   from an in camera hearing with a confidential informant, and the court prohibited defense

3   counsel from informing the defendant of the hearing, as well as the existence of the

4   confidential informant).  An evidentiary hearing is therefore not warranted under AEDPA.

5           **2.     Motion for Disclosure of Immigration Benefits**

6           Briggs also seeks discovery of government benefits provided to the victim.  A

7   habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery

8   as a matter of ordinary course.  *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

9   However, Rule 6(a) of the Federal Rules Governing Section 2254 Cases, 28 U.S.C. foll.

10  § 2254, provides that a "judge may, for good cause, authorize a party to conduct discovery

11  under the Federal Rules of Civil Procedure and may limit the extent of discovery."  Before

12  deciding whether a petitioner is entitled to discovery under Rule 6(a) the court must first

13  identify the essential elements of the underlying claim.  *See Bracy*, 520 U.S. at 904

14  (difficulties of proof aside, petitioner's allegation of judicial bias, if proved, would violate due

15  process clause).  The court must then determine whether the petitioner has shown "good

16  cause" for appropriate discovery to prove his claim.  *See id.*  Good cause for discovery

17  under Rule 6(a) is shown "'where specific allegations before the court show reason to

18  believe that the petitioner may, if the facts are fully developed, be able to demonstrate that

19  he is . . . entitled to relief . . . .'"  *Id.* at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 299

20  (1969)); *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005).

21          Having determined that Briggs fails to demonstrate that he is entitled to habeas relief

22  on his *Brady* claim, and having further found no error in the state court's factual

23  determination that there were no immigration benefits bestowed upon Briggs, the court

24  denies his motion for an order requiring disclosure of government benefits given to the

25  victim.

26  **III.    Right to Cross-Examine Victim**

27          Briggs seeks habeas relief on the related but separate ground that the trial court's

28  denial of his request to cross-examine the victim about his immigration status and denial of

United States District Court

For the Northern District of California

1   his motion for new trial violated his right to due process and the right of confrontation.  This

2   Confrontation Clause claim concerns the officers' statements about the availability of

3   immigration benefits to crime victims that are at issue in the related *Brady* claim.  The court

4   determines that the preclusion of cross-examination about the victim's immigration status

5   and the availability of immigration benefits violated Briggs's right of confrontation, but that

6   this error was harmless.

7         **A.**     **Legal Standard**

8         The Confrontation Clause of the Sixth Amendment guarantees a defendant in a

9   criminal case an opportunity for effective cross-examination of the witnesses against him.

10   *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *Murdoch v. Castro*, 609 F.3d 983, 989 (9th

11   Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 2442, *reh'g denied*, 132 S. Ct. 47 (2011).

12         "A criminal defendant can prove a violation of his Sixth Amendment rights by

13   'showing that he was prohibited from engaging in otherwise appropriate cross-examination

14   designed to show a prototypical form of bias on the part of the witness, and thereby to

15   expose to the jury the facts from which jurors . . . could appropriately draw inferences

16   relating to the reliability of the witness.'"  *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th

17   Cir. 2009) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)) (internal quotation

18   marks omitted).  "However, 'it does not follow, of course, that the Confrontation Clause of

19   the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's

20   inquiry into the potential bias of a prosecution witness.'"  *Id.* (quoting *Van Arsdall*, 475 U.S.

21   at 679).  "On the contrary, the right to cross-examination may, in appropriate cases, bow to

22   accommodate other legitimate interests in the criminal trial process."  *Id.* (citations and

23   quotation marks omitted).  As the Supreme Court recognized in *Van Arsdall*, "trial judges

24   retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable

25   limits on such cross-examination based on concerns about, among other things,

26   harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

27   repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.  "Any such 'restrictions

28   on a criminal defendant's rights to confront adverse witnesses,' however, 'may not be

1  arbitrary or disproportionate to the purposes they are designed to serve.'" *Ortiz v. Yates*, –

2  F.3d —, 2012 WL 6052251 (9th Cir. Dec. 6, 2012) (quoting *Michigan v. Lucas*, 500 U.S.

3  145, 151 (1991)) (internal citation and quotation marks omitted).

4       To determine whether the trial court's restriction on a defendant's ability to

5  cross-examine an adverse witness violates the Sixth Amendment right of confrontation

6  under *Lucas*, the court must make a two-part inquiry.  *Ortiz*, 2012 WL 6052251 at *7 (citing

7  *Fowler v. Sacramento Co. Sheriff's Dept.*, 421 F.3d 1027, 1038 (9th Cir. 2005)).  "First, we

8  ask 'whether the proffered cross-examination sufficiently bore upon the witness' reliability

9  or credibility such that a jury might reasonably have questioned it.'"  *Id.*  If the first element

10 is satisfied, the court must then consider "'whether the trial court's preclusion of this cross

11 examination was unreasonable, arbitrary or disproportionate' in light of any 'countervailing

12 interests' justifying preclusion, such as 'waste of time, confusion and prejudice.'"  *Id.*

13 (quoting *Fowler*, 421 F.3d at 1038, 1040).

14       Even where a violation of the Confrontation Clause is found, the court must assess

15 whether the error had prejudicial impact under *Brecht v. Abrahamson*, 507 U.S. 619, 623

16 (1993).  *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011), *cert. denied,* 133 S. Ct. 102

17 (2012).  Under harmless error analysis, "[h]abeas relief is warranted only if the error had a

18 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* (quoting

19 *Brecht*, 507 U.S. at 637–38).  To determine whether a violation of the Confrontation Clause

20 had "substantial and injurious effect," the court applies the five non-exclusive factors set

21 forth in *Van Arsdall*: (1) the importance of the witness' testimony in the prosecution's case;

22 (2) whether the testimony was cumulative; (3) the presence or absence of evidence

23 corroborating or contradicting the testimony of the witness on material points; (4) the extent

24 of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's

25 case.  *Id.* (citing *Van Arsdall*, 475 U.S. at 679).

26       **B.    Discussion**

27            **1.    Right of Confrontation**

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    Briggs contends that the trial court's exclusion of impeachment evidence, about

2  immigration benefits that the victim was offered or obtained, violated his right of

3  confrontation.  He argues that the officers' promises to help the victim seek immigration

4  benefits were relevant to show bias because "[t]hese promises of benefits would have had

5  a significant effect in inducing [the victim] to actually testify when he was previously

6  uninterested in pursuing the case."  Pet. at m-6.  The court of appeal, however, determined

7  that any such promises were irrelevant because they occurred two years after the victim's

8  initial report of the incident, and only after the victim gave his description of the

9  circumstances of the assault.  Answer, Ex. B at 9.

10    At trial, Officer Grant, who contacted the victim four days after the incident in August

11  2004, testified that the victim told him "at the time that he didn't want to pursue the case"

12  and "said that the incident had been extremely painful for him and he just wanted to let it lie

13  from there."  Answer, Ex. D at 308.  Officer Grant further testified that the investigation was

14  reopened in May 2006 when further information from the Oakland Police Department Crime

15  Lab identified Briggs as a potential suspect.  Answer, Ex. D at 310.  After receiving this

16  information from the crime lab, Officer Grant contacted the victim again, nearly two years

17  after the incident.  Officer Grant met the victim in person to obtain a statement and brought

18  with him another officer who spoke Spanish.  *Id.* at 310-11.

19    Briggs contends that during the victim's interview in 2006, the victim expressed his

20  concern about testifying because he was undocumented, and that one of the officers

21  promised to assist him in seeking permanent residency.  The record demonstrates,

22  however, that the officers did not make any such promise or agreement to provide

23  immigration assistance in exchange for the victim's testimony.  Further, the victim had

24  already given his account of the 2004 assault before he raised the issue of his immigration

25  status.  As determined by the court of appeal, neither the tape of the interview, nor a

26  transcript of the taped interview, were provided to the trial court or entered into evidence.

27  Answer, Ex. B at 9 n. 8.  Defense counsel, however, did not dispute the accuracy of the

28

21

prosecutor's clarification of the statements made during the interview, which the attorneys

discussed with the trial court outside the presence of the jury:

> MS. BELTRAMO:  After Miss Thomas mentioned yesterday that something was said on the tape by the police officers about making promises to help him fill out paperwork, I went back to my office and listened to the tape.  And, in fact, after he has told the police officers what happened to him, they go into how it has affected his life and if he wants to kill himself and different emotional issues.  And part of it the victims says—I wrote it down:
> "You know I don't have any papers here so I'm scared it will affect me".
> And the police officers say: "You don't need to worry about that".
> And one of the police officer [sic] said: "I have assisted people in the past with"—I wrote it down exactly—"I have signed papers for immigration assistance and they can actually qualify for residentship" [sic].
> Then Officer Grant says: "Oh, yeah, definitely being the victim of crime."
> Then they go into a different subject. They don't even talk about with him about signing papers and they don't—
>
> THE COURT: That is not the context you explained to me, Miss Thomas.  That is not how you said it happened.  That is not what you said.
> You hear her response regarding the tape?  That is not what you said.
>
> MISS THOMAS: Your Honor, I just got the tape and listened to it last night.  I have had a transcript that was provided to me by my former counsel which was transcribed by them.  It indicates basically that he was told he could get immigration assistance, but it is in 2006.

Answer, Ex. D at 128-29. When the trial court determined that the police officers

mentioned the topic of immigration assistance only after the victim had already talked about

the 2004 incident, the trial judge excluded the line of questioning about the officers'

representations regarding immigration assistance as irrelevant. *Id.* at 129.

Briggs argues persuasively that evidence of immigration benefits given to alien

witnesses is highly relevant impeachment material, citing *United States v. Blanco*, 392 F.3d

382 (9th Cir. 2004).  Reply at p-2.  There, the court of appeals held that the government

had not discharged its *Brady/Giglio* obligations when the Drug Enforcement Administration

identified a source as "simply a paid informant" and refused to disclose the fact that a

confidential informant had a "significant relationship" with the Immigration and

Naturalization Service and was granted a "special parole visa" under which he was allowed

United States District Court

For the Northern District of California

1   to stay in the United States.  392 F.3d at 388-90.  The informant testified that the

2   defendants were dealing methamphetamine, and the prosecution relied heavily on the

3   informant's testimony where there was no admissible recording of the informant's

4   interaction with the defendants and no evidence of drugs, drug paraphernalia, scales,

5   ledgers or large amounts of money was found on the defendants or at their home that

6   would have indicated a methamphetamine sales operation.  *Id.* at 386-87.  Noting that "the

7   government's case depended heavily on the jury's believing [the informant's] testimony,"

8   and that the "defense depended heavily on the jury's believing that [the informant] was a

9   liar," the court in *Blanco* held that the evidence of the informant's special arrangement with

10  INS was "highly relevant impeachment material" and found it "obvious" that the material

11  "should have been turned over to Blanco under *Brady* and *Giglio*."  *Id.* at 387, 392.

12      Briggs also cites *United States v. Bernal-Obeso,* 989 F.2d 331 (9th Cir. 1993) to

13  argue that the evidence of immigration benefits was highly relevant, Reply at p-4, but that

14  authority is not instructive on the Confrontation Clause claim presented here.  There, the

15  court of appeals remanded to determine whether the government had discharged its *Brady*

16  obligations and to determine the extent of possible impeachment material, but the

17  impeachment material did not concern an offer or receipt of immigration benefits by the

18  witness.  *Id.* at 333.

19      Applying the two-part analysis for violation of the right to cross-examine as set forth

20  in *Ortiz*, 2012 WL 6052251 at *7, the court first determines that, in light of *Blanco*, 392 F.3d

21  at 387, the officers' statements to the victim about the availability of immigration benefits to

22  victims of crime "sufficiently bore upon the witness' reliability or credibility such that a jury

23  might reasonably have questioned it."  Cross-examination of the victim, a Mexican national,

24  as to whether he was aware that testifying as a crime victim could help him obtain

25  immigration benefits would be relevant to the issue of bias.  *See* Reply on Mot. Disclose

26  and for Evid. Hrg. at 3.  If the victim subjectively believed that a police detective would

27  prepare a certification in support of his U-Visa application, then evidence of the victim's

28  belief and understanding of U-Visa program benefits would have provided relevant

23

United States District Court

For the Northern District of California

1  impeachment evidence because defense counsel could have argued that the victim would

2  have been motivated to testify by the prospect of immigration benefits, such as eligibility for

3  permanent residence.  In other words, even if no benefits were actually promised or

4  provided (as has been found), his belief that such benefits might be forthcoming would

5  certainly be relevant to his motivation to testify for the prosecution.

6      Second, the state court's determination that "the proffered evidence was irrelevant

7  and therefore inadmissible" is unreasonable.  The state court determined that the cross-

8  examination of the officers about any offers of immigration assistance was irrelevant to the

9  question of the victim's bias because the victim had already given not one but two

10  statements about the attack before any so-called offers were made.  While this court

11  agrees that the two prior statements may have diminished the value of cross-examination

12  as to the content of his statements, the issue raised here is also the need to cross-examine

13  the victim on his motivation to testify at trial, given his initial reluctance to do so.  The

14  defense could have attempted to attack his credibility by showing that although he was the

15  victim of a brutal attack, he did not initially want to pursue a criminal prosecution of the

16  perpetrator, but changed his mind, not about his statement but about testifying, only after

17  being promised immigration benefits.  In determining that the evidence was irrelevant

18  because it invited speculation, the state court did not sufficiently weigh the victim's

19  subjective beliefs about the availability of immigration benefits as evidence of bias.

20  Accordingly, the state court's preclusion of the proffered cross-examination of the victim

21  violated Briggs's right to confront an adverse witness.  *See Ortiz*, 2012 WL 6052251 at *7.

22          **2.    Harmless Error**

23      On habeas review, a Confrontation Clause violation is subject to harmless error

24  analysis.  Applying the *Van Arsdall* factors here, the court determines that the victim's

25  testimony was important in the prosecution's case and not merely cumulative because no

26  other eyewitnesses testified to corroborate the victim's account of the assault.  Other

27  factors, however, outweigh the importance of the victim's testimony in the harmless error

28  analysis, such as the admission of evidence corroborating the victim's account of the crime,

1   including the forensic results of the sexual assault examination taken on the night of the

2   incident.  Furthermore, other impeachment evidence was available to defense counsel, and

3   the record shows that the victim was subject to extensive cross-examination.  Defense

4   counsel pointed out several inconsistencies in the victim's prior statements, as found by the

5   court of appeal:

6           The defense was able to elicit inconsistencies among John
    Doe's various accounts of the assault. For example, at trial John Doe
7   testified he consumed six beers while listening to music at the
    Fandango club and denied having taken any drugs before the
8   assault. However, Paolinetti, the physician's assistant who
    conducted the sexual assault exam, testified that John Doe had told
9   her he did not consume any alcohol within 12 hours prior to the
    assault but had used drugs within 96 hours prior to the attack. John
10  Doe did not recall telling Paolinetti this information, nor did he recall
    testifying at the preliminary examination hearing that he had only
11  drank two beers.

12          Defense counsel also elicited discrepancies in John Doe's
    account regarding who carried the gun. At trial, John Doe testified
13  that the tall, thin man carried the gun as the two assailants
    approached him. On cross-examination, John Doe admitted that
14  at the preliminary examination hearing he had testified the shorter,
    heavier man was holding the gun. He then testified the men passed
15  the weapon back and forth to each other. He also stated he did not
    remember telling the officers during the 2006 taped interview that the
16  person who sexually assaulted him did not hold the gun.

17          The jury heard other inconsistencies in John Doe's description
    of the assault. For example, at trial, John Doe stated that after he
18  was assaulted he ran down Foothill Boulevard in search of help, but
    lost consciousness. In contrast, Tran testified that at the hospital on
19  August 22, 2004, John Doe stated that after he was assaulted he ran
    back to the Fandango club for help and someone at the club called
20  911. Another discrepancy concerned John Doe's account of who
    drove the truck. At trial, John Doe testified he was forced to drive the
21  truck and was unable to recall whether, in the 2006 interview, he had
    told the officers he had driven the truck. Grant, however, testified that
22  in the 2006 interview John Doe did not state he had driven the truck.
    John Doe acknowledged during cross-examination that he had told
23  the officers during the 2006 interview that the two men had him sit in
    the middle of the truck on the floorboards while they drove at a high
24  rate of speed.

25          John Doe's ability to recall the events was also explored. For
    example, John Doe did not recall speaking with Grant on September
26  2, 2004, approximately one week after the incident, and he did not
    remember telling police that he did not want to pursue criminal
27  prosecution of his assailants. John Doe also was unable to recall
    some of the statements he made to Tran, the officer who interviewed
28  him at the hospital on August 22, 2004. John Doe also could not

United States District Court
For the Northern District of California

remember testifying at the preliminary hearing that the assailants shoved him in the truck first before they entered the vehicle, which contrasts with his trial testimony that the men entered the truck and then pulled him inside. Similarly, on cross-examination, John Doe was asked about his testimony at the preliminary examination hearing regarding his ability to see underneath the blindfold because there was a little tear in it. At trial, John Doe insisted he never said there was a tear in the blindfold.

Defense counsel was able to attack John Doe's identification of Briggs. At trial John Doe stated he was 70 to 80 percent certain Briggs was the assailant who sexually assaulted him. During cross-examination, John Doe admitted that when he was interviewed by police at the hospital on August 22, 2004, he told the officer he would not be able to identify his assailants. The jury also learned that at the preliminary examination hearing John Doe testified he did not recognize Briggs as one of the assailants. On cross-examination, John Doe acknowledged that approximately one week before trial he told the prosecutor he did not identify Briggs as his assailant at the preliminary examination hearing because he was afraid that Briggs would get up and take the deputy sheriff's gun and shoot and kill him in the courtroom. On direct and re-direct examination, John Doe explained that another reason he did not identify Briggs at the preliminary examination hearing was because he was hoping Briggs would be released so he could kill Briggs himself.

This record demonstrates that Briggs had ample ability to impeach John Doe's credibility, and we are not persuaded that in light of the evidence presented, the jury would have received a significantly different impression of John Doe had the defense been permitted to question him about his immigration status, or any potential benefit he might receive regarding that status. (See *Van Arsdall, supra*, 475 U.S. at p. 680; [*People v.Frye*, 18 Cal.4th 894, 946-47 (1998)].)  Accordingly, there was no constitutional error.

Answer, Ex. B at 18-19 (summarizing defense counsel's ability to impeach the victim's credibility).  Further, the overall strength of the prosecution's case, including DNA evidence found on the victim and the testimony of investigating officers and the physician's assistant who examined the victim, minimizes the impact of excluding questions about the victim's immigration status and the officer's statement that "I have assisted people in the past . . .  I have signed papers for immigration assistance."

Even "assuming that the damaging potential of the cross-examination were fully realized," *Van Arsdall*, 475 U.S. at 684, Briggs's contention that the victim was biased by the prospect of receiving immigration benefits, such as a U-Visa, would not have substantially influenced the jury in light of all the evidence presented at trial.  Briggs

United States District Court
For the Northern District of California

contends that the outcome of trial could have been different because the issue of consent in the sexual assault prosecution turned on the victim's credibility and the defense had no theory at trial of why the victim would have had a motive to lie.  *See* Reply ISO Mot. Disclose and for Evid. Hrg. at 8.  The evidence at trial, however, showed that the victim had already given two statements to the investigating officers before the officers mentioned the possibility of seeking immigration benefits as a crime victim.  The record indicates that the discussion between the officers and the victim about the availability of immigration benefits was brief, and was raised only after the victim told the officers that he had been raped and expressed his concern about being an undocumented alien, suggesting that he feared deportation if he came forward to testify.  Evidence that the officers mentioned that immigration benefits were available to crime victims would have limited impeachment value where the victim had already given two statements to investigators and was otherwise subject to cross-examination at trial.  Furthermore, the evidence supporting Briggs's conviction included not only the victim's testimony but also testimony from investigating officers, a medical professional who examined the victim, and a DNA expert who analyzed forensic evidence obtained during the victim's sexual assault examination taken on the night of the incident.

In light of all the evidence presented at trial, the court finds that the trial court's preclusion of cross-examination on the victim's immigration status, and the officers' statements about immigration benefits, did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637 (citation and quotation marks omitted).  Briggs therefore fails to demonstrate that he is entitled to habeas relief on this Confrontation Clause claim.

**IV.**    **Right to Cross-Examine Expert Witness**

Briggs seeks habeas relief on the ground that the state court's limitations on his ability to cross-examine the prosecution's expert witness, criminalist Ines Iglesias-Lee, violated his Fifth Amendment due process rights and his Sixth Amendment right of confrontation.

United States District Court

For the Northern District of California

1

**A.     Expert Testimony**

2       At trial, the prosecution's DNA expert, Iglesias-Lee, was deemed an expert in the

3    field of forensic biology and DNA analysis.  Upon comparing the DNA profile from Briggs's

4    saliva swab to the DNA profile from the unknown sperm sample taken from the victim's

5    rectal swabs, Iglesias-Lee determined that the DNA profiles matched and that Briggs could

6    not be excluded as being the source of that DNA.  Answer, Ex. D at 282-83.  Iglesias-Lee

7    testified that in analyzing the unknown sperm sample taken from the victim's rectal swabs,

8    she performed a statistical analysis by using a computer program named Pop Stats, which

9    she defined as a "software program that is part of the CODIS program that is made the

10   F.B.I. and this program calculates the statistical frequency of the profile that we input into

11   the program." *Id.* at 287.  Based on the calculation of the statistical frequency of the sperm

12   profile, she determined that the profile occurs in less than 1 out of 1.5 trillion members of

13   the Caucasian, African American, Southwest Hispanic and Southeast Hispanic populations.

14   *Id.*  Iglesias-Lee concluded that "it would be highly unlikely that this profile would be found

15   in the population at large of unrelated individuals."  *Id.* at 288.

16       Defense counsel cross-examined Iglesias-Lee on the accuracy of the statistics used

17   by the FBI as follows:

18          Q. [Defense Counsel] Okay. So you have not independently verified
            the accuracy of those statistics.
19
            A. No. I – the numbers that were generated by the computer and the
20          number – the most common number generated in this case is the
            one that was included in the report.
21
            Q. Okay. And the F.B.I. study based on the population comes from a
22          survey of 200 people, right?

23          A. Approximately 200 people from each of the populations.

24          Q. Each of the populations.  Each of what populations?

25          A. In our lab we use the African American, Caucasian, Southeast
            Hispanic, and Southwest Hispanic populations.
26
            . . .
27
            Q. And this population of 200 persons that the F.B.I. used, they were
28          self-selected or self-identified when they came into the group?

United States District Court

For the Northern District of California

1   A. Yes, most of the—as far as I know, the people who donated these
2   samples are usually people who donate to the Red Cross, for
    example, and they self-declared their ethnicity.

3   Q. Is there anything to factor in there some of the discouragements
    that there are to self-disclose a particular race?

4
5   A. I don't understand your question.

    Q. Well, how do you define, for example, African American? Is it a
6   person who is 100 percent African American? 1 percent? Less than 1
    percent?

7   MS. BELTRAMO [Prosecutor]: Objection, relevance.
8
    THE COURT: Sustained. She doesn't define anything.
9
    MS. THOMAS: Q. How did the F.B.I. define it in the computer
10  program that you used to determine this 1 in 1.5 trillion?

11  MS. BELTRAMO: Objection, calls for speculation.

12  THE COURT: If you know only. If you don't know, you don't know.

13  THE WITNESS: As far as I know, the samples—the ethnicity was
    self-declared.
14  I do want to make a point that the statistical analysis is not performed
    on the sample of the defendant in this case, Marquez Briggs. We
15  perform the calculation on the profile of the evidence and the
    evidence doesn't have a race, so to speak.
16
    MS. THOMAS: Q. Right. But your computation—the occurrence of
17  that particular D.N.A. profile is based on race, correct?

18  A. That's correct. And we use those—the most common out of the
    four of the populations.
19
20  Q. So is there any room for error in your calculation?

    A. Not that I can see, no.
21
22  Q. Were there any controls in the F.B.I. group when they made these
    calculations as to the geology [sic] as to where the people were
23  selected from when they came up with these statistical demographic
    numbers?

24  MS. BELTRAMO: Objection, calls for speculation, lack of foundation.

25  THE COURT: Sustained.

26  MS. THOMAS: Q. You are an expert in D.N.A., right, forensic
    D.N.A.?
27
    A. Forensic D.N.A., yes.
28

29

United States District Court
For the Northern District of California

1   Q. One of the tools you use is the F.B.I. program.

2   A. That's correct.

3   Q. And that is accepted in the community.

4   A. That is correct.

5   Q. In the scientific community.

6   A. Yes.

7   Q. Not the lay community. And it is something that you know about
    and use and rely on in your work, right?
8
    A. Correct.
9
    Q. So can you tell me whether these 200 people came from a little
10  enclave in Minnesota?

11  MS. BELTRAMO: Objections, relevance.

12  THE COURT: Sustained.

13  THE WITNESS: Well—

14  THE COURT: Sustained. You don't answer that question. It is
    sustained.
15

16  Answer, Ex. D at 290-92.

17      **B.    Discussion**

18      Briggs contends that the trial court improperly restricted his cross-examination of the

19  DNA expert in violation of his right of confrontation and due process rights.  He argues that

20  Iglesias-Lee conceded that she was not an expert in statistics, and admitted that for her

21  statistical analysis, she relied on an FBI program using a database in which the subjects

22  self-declared their ethnicity.  Pet. ¶ 29.  Briggs contends that the trial court erred by

23  excluding questions about what controls the FBI had used in its sampling to account for

24  geographical areas from which the subjects were selected.  Briggs fails to make any

25  argument or demonstration how these limits on the expert's cross-examination had a

26  "substantial and injurious effect" in determining the jury's verdict to establish a basis for

27  habeas relief under *Van Arsdall*, 475 U.S. at 679.

28

30

United States District Court

For the Northern District of California

1    Respondent opposes this Confrontation Clause challenge on the ground that Briggs

2    failed to present it in state court and the claim is procedurally defaulted.  Answer at 28.

3    Briggs does not address the issue of procedural default in his reply brief.  The record

4    demonstrates that Briggs raised this Confrontation Clause challenge for the first time on

5    direct appeal.  The court of appeal held that the claim was forfeited because Briggs failed to

6    present the argument at trial or in his motion for new trial.  Answer, Ex. B at 20.

7    Nevertheless, the court of appeal addressed Briggs's arguments on direct review.  *Id.*

8    Because the state court considered Briggs's Confrontation Clause claim on the merits,

9    procedural default does not bar habeas review and the court may reach the merits of the

10   claim.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be

11   presented with a particular federal claim reaches the merits, it removes any bar to federal

12   court review that might otherwise have been available.").

13   Respondent argues in the alternative that even if the Confrontation Clause claim

14   were not in procedural default, the claim for habeas relief should be denied because the

15   state court properly rejected Briggs's claim.  The court of appeal rejected Briggs's argument

16   that the trial court erred by sustaining the objections to questions about the accuracy of the

17   statistics used in the FBI software program:

18       Briggs contends the trial court erroneously limited his
         cross-examination of Iglesias-Lee regarding the statistical basis for
19       her testimony that Briggs's DNA profile "occurs in less than 1 out of
         1.5 trillion" people. He suggests that Iglesias-Lee was "just reading a
20       number calculated by a computer program and had no
         understanding of the statistics involved." According to Briggs, the
21       DNA profile frequency evidence was a critical component of the
         prosecution's case, and if he could have shown that Iglesias-Lee did
22       not understand the statistics involved, the 1 in 1.5 trillion figure would
         have been meaningless and the jury would not have considered it.
23       For this reason, Briggs argues the trial court's restrictions on Iglesias-
         Lee's cross-examination improperly hindered his ability to test the
24       validity of that evidence, thereby violating his right of confrontation
         and his right to present a defense. The State maintains Briggs's
25       constitutional claims are forfeited, and that he was allowed broad
         examination of Iglesias-Lee regarding the statistical basis for her
26       testimony.

27       We agree with the State that Briggs's constitutional claims
         regarding this issue are forfeited because Briggs failed to present
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

them either during trial or in his motion for new trial. *(See People v. Tafoya* (2007) 42 Cal.4th 147, 166 [defendant forfeited confrontation clause claim by failing to raise it at trial]; *People v. Rudd* (1998) 63 Cal.App.4th 620, 628-629 [generally a constitutional claim must be raised in the trial court to preserve the issue for appeal].) Even assuming the claims are not forfeited, we conclude the trial court's ruling was not an abuse of discretion and violated neither Briggs's right of confrontation nor his right to present a defense.

Briggs's claim that Iglesias-Lee appeared to have little or no understanding of the statistics involved in calculating the DNA profile frequency has no support in the record. Iglesias-Lee testified that, although she is not an expert in statistics, she does have a "working knowledge of the basic concepts," and she used Pop Stats--an FBI software program generally accepted in the scientific community--to determine the DNA profile frequency in this case. Significantly, Briggs does not demonstrate that he was prohibited from probing into the limits of Iglesias-Lee's understanding of statistical concepts and how or whether those limitations could affect her ability to testify regarding the DNA frequency profile calculation she obtained.

The only restrictions placed on defense counsel's cross-examination of Iglesias-Lee regarding the DNA profile frequency statistic concerned her knowledge of the population database controls used by the FBI in creation of the software program.  Iglesias-Lee testified that the FBI population database comes from approximately 200 people from each of the African-American, Caucasian, Southeast Hispanic, and Southwest Hispanic populations. She explained they do not use Asian populations in her laboratory, but clarified that if necessary her laboratory would be able to use the Asian database. She also stated that to her knowledge, the people who donated the samples were usually people who donate to the Red Cross, for example, and they self-identified their race. She did not independently verify the accuracy of the statistics contained in the FBI data. When defense counsel asked if there "[w]ere there any controls in the [FBI] group when they made these calculations as to the geology [sic] as to where the people were selected from when they came up with these statistical demographic numbers," the trial court sustained the prosecutor's speculation and lack of foundation objections. Defense counsel also asked Iglesias-Lee if the population used for the FBI survey "came from a little enclave in Minnesota." The prosecutor objected based on relevance, and the trial court again sustained the objection.

Briggs emphasizes the importance of having wide latitude to test the credibility of witnesses and the validity of DNA evidence. Other than the two inquiries regarding the population used in the FBI database, Briggs does not identify what other lines of questioning were foreclosed which would have been relevant to Iglesias-Lee's credibility or her expertise. Further, the record shows Briggs was afforded the opportunity to question Iglesias-Lee regarding her analysis of the DNA evidence, how she derived the DNA profile

frequency statistical figure, and her understanding of the FBI software program she employed to obtain that calculation.

The record also demonstrates the jury heard evidence bearing on Iglesias-Lee's credibility and the weight to be given to the statistical evidence. First, on direct examination she admitted that she made a mistake when writing a date on one of the envelopes containing oral swabs. She acknowledged during cross-examination that she was not a "computer program software person." On direct examination, Iglesias-Lee testified that "[e]ach person's [DNA] is unique with the exception of identical twins which share the same [DNA]." On cross-examination she admitted she did not know whether Briggs was a twin.

The trial court's rulings were not an abuse of discretion. The information sought had at best collateral impeachment value, and Briggs has not demonstrated how the prohibited cross-examination would have been important to assess the weight of the DNA profile frequency evidence. Having reviewed the record, we conclude the excluded cross-examination into collateral issues regarding the population data used to create the FBI software program would not have given the jury a "significantly different impression" of Iglesias-Lee's credibility and therefore the trial court's ruling did not violate Briggs's confrontation right. (See *Van Arsdall*, *supra*, 475 U.S. at p. 680; *Frye, supra*, 18 Cal.4th at p. 947.)

In his argument that the trial court's rulings violated his right to confront witnesses, Briggs maintains this error also deprived him of his constitutional right to present a defense. This right requires that a defendant be able "'to present all relevant evidence of significant probative value to his defense.'" (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) Further, "[a]s a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 (*Fudge*), first and last instances of bracketed material added.)

Even if this issue had been properly preserved, we find no constitutional error. The record demonstrates "the trial court's ruling did not constitute a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.) Briggs was permitted to cross-examine Iglesias-Lee regarding the population used to establish the FBI database. The only lines of questioning that were precluded concerned what controls existed in the FBI population database, and whether the subjects came from a limited geographic area. Briggs has not identified any other lines of questioning he was foreclosed from pursuing which hampered his defense, and he was certainly not foreclosed from presenting affirmative evidence from an expert of his own if he felt that the prosecution's evidence was susceptible of meaningful impeachment in this respect.  [Footnote omitted.]

We conclude the trial court's rulings limiting Iglesias-Lee's cross-examination merely rejected certain evidence on a minor and

33

United States District Court

For the Northern District of California

1

2

3

      collateral issue. As such, they do not amount to a constitutional violation because "excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]" (*Fudge*, supra, 7 Cal.4th at p. 1103.)

4   Answer, Ex. B at 20-23.

5        Briggs fails to demonstrate that his proffered cross-examination sufficiently bore

6  upon the DNA expert's credibility "such that no fairminded jurist could disagree that the

7  cross-examination could have influenced the jury's assessment of her." *Ortiz*, 2012 WL

8  6052251 at *7. The court of appeal considered that this line of cross-examination would

9  have addressed only a minor or subsidiary point, and concluded that this cross-examination

10  would have had at best collateral impeachment value to justify the trial court's curtailment of

11  cross-examination. The state court's decision to curtail the proffered cross-examination

12  was not contrary to, or an unreasonable application of, clearly established federal law and

13  did not violate Briggs's right of confrontation.

14        Even if the trial court's limitation on the DNA expert's cross-examination amounted

15  to constitutional error, any such error was harmless in light of the evidence presented at

16  trial. Applying the *Van Arsdall* factors, the court determines that Iglesias-Lee's testimony

17  was important to address the weight of the forensic evidence and was not cumulative. The

18  other *Van Arsdall* factors do not, however, show that the limitation on her cross-

19  examination had a prejudicial effect. The record shows that there was significant DNA

20  evidence showing that Briggs's DNA profile matched the DNA profile of the semen sample

21  taken from the victim's rectal swab, to support and corroborate the expert's findings. As the

22  court of appeal determined, defense counsel was permitted extensive cross-examination to

23  challenge Iglesias-Lee's credibility, including questions about her analysis of the DNA

24  evidence, how she derived the DNA profile frequency statistical calculation, and her

25  understanding of the FBI software program that she used to make that calculation. Finally,

26  the prosecution presented a strong case, which included testimony from the victim,

27  investigating officers and the medical professional who examined the victim, as well as

28  forensic evidence. Viewed in the context of the record as a whole, any error in excluding

United States District Court

For the Northern District of California

1   questions about the population used in the FBI database was harmless and did not have a

2   substantial and injurious effect on the jury verdict.  *Van Arsdall*, 475 U.S. at 679.

3         The state court's rejection of Briggs's Confrontation Clause challenge to the

4   limitations on his cross-examination of the DNA expert was neither contrary to, nor an

5   unreasonable application of, clearly established federal law.  This claim for habeas relief is

6   therefore denied.

7                                    **CONCLUSION**

8         For the reasons set forth above, Briggs's petition for a writ of habeas corpus is

9   DENIED.  This order fully adjudicates the petition and terminates all pending motions.  The

10  clerk shall close the file.

11                          **CERTIFICATE OF APPEALABILITY**

12        To obtain a certificate of appealability, Briggs must make "a substantial showing of

13  the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has

14  rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is

15  straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

16  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

17  *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a

18  COA to indicate which issues satisfy the COA standard.  Here, the court finds that the

19  following issue presented by Briggs in his petition meets that standard: whether the state

20  court's refusal to allow him to cross-examine the victim regarding the officers' statements

21  about immigration benefits violated his Sixth Amendment right of confrontation and was not

22  harmless error.  Accordingly, the court GRANTS the COA as to that issue.  *See generally*

23  *Miller-El*, 537 U.S. at 322.

24  \\

25  \\

26

27

28

                                           35

1    The clerk shall forward the file, including a copy of this order, to the Court of

2  Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir.

3  1997).

4    **IT IS SO ORDERED.**

5  Dated: January 22, 2013

6                                                                              _____

7                                                                              PHYLLIS J. HAMILTON
                                                                                United States District Judge